1  SEAN P. GATES (CA SBN 186247)
   SGates@mofo.com
2  MORRISON & FOERSTER LLP
   707 Wilshire Boulevard
3  Los Angeles, California 90017-3543
   Telephone: 213.892.5200
4
   Attorney for Plaintiffs
5  John Doe I, John Doe II, John Doe III, John Doe IV,
   and John Doe V
6

7

8              UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  JOHN DOE I, JOHN DOE II, JOHN DOE III, JOHN DOE IV, AND JOHN DOE V,<br><br>12                    Plaintiffs,<br><br>13           v.<br><br>14  PURE FOREST, LLC, JEFF WADSWORTH, OWEN WADSWORTH,<br><br>16                    Defendants. | Case No. 2:14-cv-00879-LKK-CMK<br><br>**DECLARATION OF SEAN GATES IN SUPPORT OF PLAINTIFFS' MOTION TO PROCEED UNDER FICTIOUS NAMES** |

17

18

19

20

21

22

23

24

25

26

27

28

1    I, SEAN GATES, declare under penalty of perjury that the following is true
2    and correct.

3        1.    I am a partner at the law firm of Morrison & Foerster, LLP, counsel
4    for Plaintiffs John Doe I, John Doe II, John Doe III, John Doe IV, and John Doe V
5    in the above-entitled action.  I am admitted to practice in the State of California and
6    in this Court.  I have personal knowledge of the matters stated herein, and if called
7    upon to do so, I would testify competently to those matters.

8        2.    Attached hereto as Exhibit A is a true and correct copy of an
9    Application and Affidavit for Search Warrant filed on May 6, 2014 in Case No.
10   2:14-sw-00297-AC (E.D. Cal.).  As stated in the Affidavit, the U.S. Department of
11   Homeland Security and U.S. Department of Labor are conducting a joint
12   investigation of Pure Forest LLC, the owners (Jeff and Owen Wadsworth),
13   employees, and foremen of Pure Forest for labor trafficking and related criminal
14   violations.  (Ex. A at ¶¶ 1, 4, 13.)

15       3.    Attached hereto as Exhibit B is a true and correct copy of an
16   indictment for Pedro Carbajal-Osorio, aka Pedro Carbajal, Jr., filed on May 22,
17   2014 in Case No. 2:14-cr-00150-JAM (E.D. Cal.).  Mr. Carbajal was indicted on
18   two counts as an illegal alien in possession of a firearm.  (Ex. B at 5.)  Mr. Carbajal
19   was one of the foreman for Pure Forest and was allegedly involved in the
20   trafficking.  (Ex. A at ¶¶ 14, 25.)

21       4.    I have been informed by Nirav Desai, Assistant United States
22   Attorney, that the U.S. Attorney's Office, Eastern District of California, may seek
23   to stay this civil action pending the criminal investigation.

24       5.    The parties have also discussed a possible voluntary stay of this action
25   pending the criminal investigation.

26   ///
27   ///
28   ///

1

1        I declare under the penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3

4        Executed on June 5, 2014 at Los Angeles, California.

5

6                       *Sean P. Gates*

7                   SEAN P. GATES

8   la-1242988

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GATES DECLARATION IN SUPPORT OF MOTION
TO PROCEED UNDER FICTITIOUS NAMES

# Exhibit A

**SEALED** **FILED**

AO 106 (Rev. 12/03)  Affidavit for Search Warrant

MAY 0 6 2014

# United States District Court

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

**EASTERN**  District of  **CALIFORNIA**

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

The Premises Located at 617 Mariposa Avenue, Gerber, CA 96035; a Silver Nissan Pickup Truck (CA 6L60117); and a Grey Ford Pickup Truck (CA 04453J1

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER:

**2:14 - SW - 2 9 7      AC**

I, Special Agent Eugene Kizenko, being duly sworn depose and say:

I am a Special Agent with the U.S. Department of Homeland Security, Homeland Security Investigations, and have reason to believe that ☐on the person of or ☒on the property or premises known as (name, description and/or location)

**617 Mariposa Avenue, Gerber, CA 96035; a Silver Nissan Pickup Truck (CA 6L60117); and a Grey Ford Pickup Truck (CA 04453J1; as described in ATTACHMENT A, which is attached hereto and incorporated by reference,**

in the _____**EASTERN**_____  District of _____**CALIFORNIA**_____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of The Federal Rules of Criminal Procedure)

property that constitutes evidence, fruits, and/or instrumentality of a criminal offense

concerning a violation of Title 18 United States Code, Sections 1589, 1590, 1351, 1546, 1341, and 1343.

The facts to support a finding of probable cause are as follows:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

Continued on the attached sheet and made a part hereof.     ☒Yes  ☐No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

_____5/6/14_____    at  Sacramento, California
Date                                     City    State

_____                                        _____
Allison Claire,  U.S. Magistrate Judge                          Signature of Judge

2

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE SEARCH OF
THE PREMISES LOCATED AT 617
MARIPOSA AVENUE, GERBER, CA 96035;
A SILVER NISSAN PICKUP TRUCK (CA
6L60117); AND A GREY FORD PICKUP
TRUCK (CA 04453J1)

Case No.

**FILED UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION FOR A SEARCH WARRANT

I, Eugene Kizenko, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant authorizing the

search of the home owned by Jeff Wadsworth located at **617 Mariposa Avenue, Gerber,**

**California 96035** (SUBJECT PREMISES), and the seizure of evidence, fruits, and

instrumentalities of violations of the following provisions of the United States Code:  18 U.S.C.

§ 1589 (Forced Labor Trafficking); 18 U.S.C. § 1590 (Trafficking with Respect to Peonage,

Slavery, Involuntary Servitude, or Forced Labor); 18 U.S.C. § 1351 (Fraud in Foreign Labor

Contracting); 18 U.S.C. § 1546 (Visa Fraud); 18 U.S.C. § 1341 (Mail Fraud); and 18 U.S.C.

§ 1343 (Wire Fraud).  I request that the search warrant authorize the search of all rooms,

common areas, attics, basements, and all other parts therein, and surrounding grounds, garages,

storage sheds, storage rooms, barns, trailers, or outbuildings of any kind, attached or unattached,

located on the SUBJECT PREMISES.  I also request that the search warrant authorize the search

of locked, closed, barred, encircled or other otherwise secured containers located on the

SUBJECT PREMISES.  I further seek authorization to search a Nissan Pickup Truck with

California License Plate Number 6L60117 (SUBJECT VEHICLE # 1) and a Ford Pickup Truck

1

with California License Plate Number 04453J1 (SUBJECT VEHICLE #2), including all internal and external compartments and all containers, locked or unlocked, in which evidence, fruits, and instrumentalities of the above-stated violations may be found, and to seize such evidence, fruits, and instrumentalities of the violations. The SUBJECT PREMISES and SUBJECT VEHICLES are further described in Attachment A, which is attached hereto and fully incorporated by this reference. The evidence, fruits, and instrumentalities to be searched for and seized are described in Attachment B, which is attached hereto and fully incorporated by this reference.

2.      I am a Special Agent (SA) with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), presently assigned to the Office of the Assistant Special Agent in Charge, Sacramento, CA. I have been employed as a Special Agent for more than 10 years. I was previously employed with the United States Immigration and Naturalization Service (INS) as Special Agent for more than 10 years. My duties as an HSI Special Agent include the investigation of criminal violations including the violations of the United States Code mentioned in the first paragraph of this affidavit.   I have participated in the execution of search and arrest warrants and have seized evidence of violations of federal law.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents including Special Agent Chris Collins, of the U.S. Department of Labor, Office of the Inspector General. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

2

### SUMMARY OF INVESTIGATION

4.     The U.S. Department of Homeland Security, Homeland Security Investigations, and the U.S. Department of Labor (DOL), Office of Inspector General (OIG) are conducting a joint investigation into a forestry company named Pure Forest, LLC (Pure Forest), the owners, employees, and foremen of Pure Forest, and a company affiliated with Pure Forest, Lightning W Ranch, LLC (Lightning W Ranch). The investigation, so far, has revealed that during the 2012 forestry season, Pure Forest had four groups of workers located at various sites owned or controlled by Sierra Pacific Industries in Northern California. Pure Forest, and its owners and foremen, are suspected of participating in a forced labor/visa fraud scheme involving migrant workers from Mexico. In a forced labor/visa fraud scheme, an employer uses legal means (e.g., labor visa programs such as the H-2B visa program) to bring foreign workers into the United States for employment, only to illegally exploit them after they arrive.

### BACKGROUND: APPLICABLE LABOR LAWS

5.     If a U.S. employer cannot find U.S. workers that are able, willing, qualified, and available for an employer's temporary job opportunity, the employer employs a foreign worker (i.e., an alien) by filing a non-immigrant petition seeking a temporary employment visa for the alien. The petition must be filed with the DOL and U.S. Citizenship and Immigration Services (CIS). An employer seeking to employ a non-immigrant alien temporarily in non-agricultural services for a seasonal, peak load, or intermittent basis may obtain foreign workers through the H-2B labor visa program.

6.     An employer desiring to use foreign workers for H-2B temporary, non-agricultural employment, must file a completed ETA Form 9142, Application for Temporary Employment

Certification, with the DOL.  As part of the petition to the DOL, the employer must make certain

attestations, under penalty of perjury, including:

      a) The employer is offering terms and working conditions normal to U.S. workers

similarly employed in the area of intended employment;

      b) The employer will comply with applicable Federal, State and local

employment-related laws and regulations, including employment-related health and safety laws;

      c) The employer is offering a wage that equals or exceeds the highest of the

prevailing wage, the applicable Federal minimum wage, the State minimum wage, and local

minimum wage and the employer will pay the offered wage during the entire period of the

approved H-2B labor certification;

      d) The employer has not sought or received payment of any kind from the

employee for any activity related to obtaining labor certification, including payment of the

employer's attorneys' fees, or recruitment costs.  Payment includes, but is not limited to,

monetary payments, wage concessions (including deductions from wages, salary, or benefits),

kickbacks, bribes, tributes, in kind payments and free labor.

    7.    If the DOL approves the ETA Form 9142, the employer must then file with CIS a

copy of the ETA Form 9142 and a CIS Form I-129, Petition for Non-Immigrant Worker.  In the

Form I-129, the employer must provide, under penalty of perjury, the number of hours per week

to be worked and the hourly wage rate.  In addition, the employer must answer certain questions

under penalty of perjury including, but not limited to, whether the workers that the employer has

located or plans to hire have paid the employer, or any service agent, any form of compensation

as a condition of the employment; or whether the employer and such workers have an agreement

4

through which the worker will at a later date pay the employer for government visa fees or other reasonable fees for which the worker is responsible, not to include reasonable travel expenses.

8.      If CIS approves the Form I-129, Petition for Non-Immigrant Worker, the employer may assist the visa beneficiary (i.e., the worker) to apply for a visa with the U.S. Department of State (DS).  Form DS-160 is submitted electronically to the DS's website via the Internet. Consular Officers use the information entered on the Form DS-160 to process the visa application and, combined with a personal interview, determine an applicant's eligibility for a nonimmigrant visa.

9.      Once H-2B workers are approved to work in the United States, the Migrant and Seasonal Agricultural Worker Protection Act (MSPA), the Field Sanitation Provisions of the Occupational Safety and Health Act of 1970 (OSHA), and the Fair Labor Standards Act (FLSA) provide protections for the H-2B visa workers.  Generally, the MSPA applies to any person (or business) who recruits, solicits, hires, employs, furnishes, or transports migrant or seasonal agricultural workers (the MSPA refers to these activities as "farm labor contracting activities"). Before performing any "farm labor contracting activities," farm labor contractors are required to submit Form WH-530 to the DOL for a Certificate of Registration authorizing the applicant to engage in "farm labor contracting activities."  Depending on the specific activities for which an employer is seeking authorization, an employer may be required to submit additional forms and documentation with the Form WH-530.  For example, if an employer seeks to house the workers, the employer must apply for a Housing Occupancy Certificate.

10.     The MSPA further requires that employers properly disclose to workers all terms and conditions of employment, including wages to be paid, and then pay all wages owed when due. The MSPA also details housing requirements for workers, but the forestry industry is largely

5

exempted from these regulations, recognizing that camping is often essential in the forestry industry. The employer must obtain a permit from the DOL's Wage and Hour Division to house workers at a campsite. A 1994 Memorandum of Understanding between the U.S. Forest Service and the DOL's Wage and Hour Division details the guidelines for approved campsites. The guidelines include: suitable structures to protect the workers from the elements like cold temperatures, and an adequate and convenient drinking water supply, which must be approved by the appropriate health authority.

11.     OSHA requires employers to provide, at no cost to the workers, potable drinking water in suitably cool and sufficient amounts, dispensed in single-use cups or by fountains, located so as to be readily accessible to all employees. OSHA regulations in 29 CFR § 1910.141(a)(2) define "potable water" as water that meets the standards for drinking purposes of the State or local authority having jurisdiction, or water that meets the quality standards prescribed by the U.S. Environmental Protection Agency's National Primary Drinking Water Regulations (40 CFR § 141).

12.     The FLSA requires that covered employees must receive overtime pay for hours worked over 40 in a workweek at a rate not less than time and one-half their regular rates of pay. The regular rate of pay cannot be less than the minimum wage. The FLSA also contains an overtime exemption for forestry or lumbering operations employing eight or fewer workers in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal.

## **PROBABLE CAUSE**

13.     Jeff Wadsworth and Owen Wadsworth are the owners of Pure Forest, a forestry company based in Oakley, Idaho, which is affiliated with Lightning W Ranch, LLC. A filing with the Idaho Secretary of State reflects that Lightning W Ranch, LLC does business under the assumed name of "Pure Forest LLC," and that Jeff Wadsworth is the "CEO." Jeff Wadsworth also owns additional property including the SUBJECT PREMISES in Gerber, CA. A Residential Purchase Agreement dated November 15, 2012, obtained from a search warrant of Jeff Wadsworth's email indicated that "Jeffrey Bruce Wadsworth" bought the SUBJECT PREMISES.

14.     One of the Wadsworths' foremen, Pedro Carbajal, Jr. (Pedro Carbajal), currently resides at the SUBJECT PREMISES with members of his family, based on source information and the fact that a vehicle registered to CARBAJAL was seen in front of the SUBJECT PREMISES last month.

15.     During the 2012 forestry season (a season typically runs from April to December), Pure Forest served as a contractor for Sierra Pacific Industries, a forest products company based in Anderson, California that owns 1.9 million acres of timberland in California and Washington. As a contractor, Pure Forest provided herbicide and pesticide spraying, tree thinning services, and tree planting services. Pure Forest had no subcontractors perform work on its behalf. Pure Forest was paid in the ranges of $60 to $65 per acre, $28 to $35 per man-hour, and/or $0.18 per tree planted. A letter dated January 12, 2012, from a Sierra Pacific Industries representative, Bryan Taylor, was submitted with the visa petition submitted by Pure Forest to CIS. The letter confirmed Sierra Pacific Industries' need for the services of Pure Forest from April 1, 2012, to January 31, 2013.

7

16.     During the 2012 forestry season, Pure Forest had four groups of workers located at various Sierra Pacific Industries sites in Northern California. Each work crew was supervised by one of Pure Forest's foremen. The foremen have been identified as Owen Wadsworth, Jose Luis Osorio Amador (a.k.a. Cirilo Amador), Arturo Carbajal, and Pedro Carbajal. According to the quarterly payroll reports Pure Forest submitted to the California Employment Development Department (EDD), Pure Forest employed 30 to 40 people during the 2012 forest season.

17.     On February 6, 2012, Owen Wadsworth submitted by mail an ETA Form 9142, Application for Temporary Employment Certification, to the DOL attesting, under penalty of perjury, that his company, Pure Forest, needed 25 tree pruners to work in unspecified locations in Humboldt, Trinity, and Mendocino counties in Northern California from April 1, 2012, to January 31, 2013. Owen Wadsworth also attested, under penalty of perjury, that Pure Forest would pay the H-2B workers $16.47 per hour for 40 hours per week.

18.     Per the DOL's regulations, public notice was provided about the job opportunity with Pure Forest in newspapers and the Idaho state workforce agency. In one newspaper, the Humboldt Beacon, the Pure Forest job advertisement stated that the company had 25 positions for tree pruners with a salary of $16.47 per hour and 40 hours of work a week. The advertisement instructed interested job seekers to fax a "generic application" to 208-906-8514. The advertisement ended by stating that Pure Forest is an equal opportunity employer. The DOL reviewed records reflecting that in response to this public notice, at least ten U.S. workers applied for the position by following instructions in the job posting and faxing their applications to 208-906-8514, which is a facsimile number that appears to forward facsimiles directly to an e-mail account of Jeff Wadsworth. The DOL also reviewed an "Employer Summary Statement of Recruitment" submitted with the Labor Certification Application, which was signed by Owen

8

Wadsworth for Pure Forest on February 6, 2012, and thereafter submitted to the DOL by Infinity Labor Source, a labor contractor based in Texas. In this document, Owen Wadsworth stated that Pure Forest received five – not ten – applications. Furthermore, this document also shows that none of the U.S. applicants were hired for the available positions.

19.     After the CIS Form I-129 was approved, applications for visas were submitted to the DS. During the interview process in June 2012, the DS, Consulate General in Nuevo Laredo, Mexico, contacted Owen Wadsworth to ask questions regarding the petition for H-2B employees. According to a report of that interview, Owen Wadsworth told the consular official that the workers would only be pruning trees and would not be using any chemicals.

20.     Jeff Wadsworth registered with the DOL as a Farm Labor Contractor (valid from April 1, 2012, to March 31, 2014). On February 15, 2012, Jeff Wadsworth signed and submitted DOL Form WH-530 and attested to the following under penalty of perjury: "I hereby declare that I will not house migrant agricultural workers in any facility or real property I own or control until I have submitted all necessary written evidence and have been issued a Certificate of Registration with housing authorized." According to the agency that administers the Farm Labor Contractor program, the DOL Wage and Hour Division, Jeff Wadsworth never submitted any additional information.

21.     On January 23, 2013, six former H-2B employees of Pure Forest alleged to the DOL that while they were in Hidalgo, Mexico, they were recruited to work during the 2012 forestry season by Pure Forest and the Texas-based labor contractor, Infinity Labor Source. Workers were told by Infinity Labor Source they would make $16.47 per hour and work 40 hours per week cutting branches from trees in the forests of Northern California, and would be housed in trailers without paying rent. One group of workers arrived in California in April 2012, and

9

another group of workers arrived in July 2012. According to the workers' statements to law enforcement, after they arrived with their H-2B visas, Pure Forest exploited them while they were employed as forest workers until they were terminated in October 2012.

22.     The workers alleged that after the visas were approved, Jeff Wadsworth drove some of the workers from the Texas-Mexico border to Northern California to begin work. Other workers flew to Sacramento, California where they were picked up by Owen Wadsworth. Upon their arrival in California, the workers were housed temporarily on the property of the various residences of Pure Forest's foremen in Gerber, California, which were located in Tehama County, California. Other workers were taken to the house of Owen Wadsworth's grandfather. The property is located in Garden Valley, California, in El Dorado County, California. A public records database indicated that the property was owned by Trusten B Wadsworth and Dorothy Wadsworth.

23.     The workers were then taken to a campsite in the woods about an hour and a half from Gerber, where they worked for Pedro Carbajal. As explained below, that campsite was located in Butte County, California. Pedro Carbajal's campsite had two camping trailers and multiple tents. Contrary to statements made to them while being recruited to work for Pure Forest, the workers were required to sleep in tents, and regardless of the weather conditions. When workers expressed concerns about bears and rattlesnakes, Pedro Carbajal reportedly told workers that they should be grateful that they did not have to suffer to get to the United States like other immigrants do.

24.     Each day the workers were transported from their campsite to a worksite about an hour away. The workers allege that in addition to thinning trees, which they had expected to do, they were also required to spray chemicals, which they had not expected to do. The workers

10

were provided blue overalls and latex gloves and cloth gloves. The workers claim that the latex

gloves would break and the cloth gloves did not provide proper protection from the chemicals.

Sometimes the workers had to spray chemicals in an upward direction, which caused the

chemicals to land on their faces. The chemicals were dyed purple so that one could see what

areas had been sprayed. One worker knew when he had chemicals on his skin because his hands

and face would be purple. Some of the workers believe they became ill as a result of exposure

of their eyes and skin to the chemicals, resulting in vomiting, skin peeling, and burning of the

eyes.

25.     Two of Pure Forest's foremen, Pedro Carbajal and Arturo Carbajal, reportedly carried

firearms and threatened to shoot workers in the head and leave them in the woods if they did not

work harder. Multiple workers heard these threats and said they were directed at the workers

who were not working hard enough. Sometimes at the campsite, Pedro Carbajal would start

shooting a gun without warning or explanation; the workers interpreted this as an act of

intimidation, which frightened them. The workers claim that Pedro Carbajal called them

worthless and threatened to send them home to Mexico if they could not handle the workload.

Pedro Carbajal also reportedly told workers that he would take them to the "calabozo" if they

worked too slowly. The workers did not know the meaning of "calabozo" and never asked what

it meant. DOL SA Chris Collins conducted a search on Google for the word "calabozo," and

one website translated that word to mean prison or jail cell. A worker also claimed that one of

the foremen would dress in camouflage, hide in the woods, and sneak up on them.

26.     The workers' drinking water came from a nearby river. At the end of the work day, a

Pure Forest truck would stop at the river and get water from the river using a water pump.

Workers claimed that the river water was in no way treated for cleanliness or hygiene. On

October 29, 2013, SA Collins spoke to a Registered Environmental Health Specialist at the Butte County Public Health Department, Division of Environmental Health, which regulates and enforces state and county laws for the area of where Pedro Carbajal's worksite was located. SA Collins was told that water from a river or creek was "absolutely not acceptable" as a source of drinking water. The official also stated that even with filtering, chlorination, or UV treatment, the river water is not considered acceptable as a drinking source.

27.     The workers claimed that they worked from approximately 6:00 a.m. to 7:00 p.m. on Monday through Saturday, and for approximately three hours on Sundays, none of which included an approximately one-hour commute to and from the work site. The workers alleged that they were paid in cash below the wages promised to them and attested to by Owen Wadsworth in the ETA Form 9142 submitted to the DOL. The pay was less than promised, the workers claim, because of deductions in pay for visa fees, meals, and the cook. Pure Forest paid the workers once every two weeks, but the workers were required to pay Pure Forest between $2,000 and $2,200 for their respective H-2B visas. One worker asked Owen Wadsworth why the workers had to pay a visa fee, and Owen Wadsworth reportedly told the worker to ask Jeff Wadsworth or Jose Luis Osorio Amador about that issue. Another time a worker asked Jose Luis Osorio Amador about the visa fee, and Amador told the worker to ask Jeff Wadsworth. A worker asked Jeff Wadsworth about the visa fee, and Jeff Wadsworth told the worker to ask Jose Luis Osorio Amador.

28.     The workers provided DOL Special Agents with photocopies of envelopes in which the cash payments were distributed. The envelopes were distributed to each worker by that worker's respective foreman. Each envelope had the worker's name hand-written on it with his salary and deductions. For example, one photocopied envelope provided to DOL Special Agents

had a worker's name with the notation of $1,100 minus $600 for the visa, for a total of $500.
The workers on Pedro Carbajal's crew said that Pedro Carbajal would deduct additional fees for
the cook, Pedro Carbajal, Sr. (Pedro Carbajal, Jr.'s father), and for additional food purchases.
The fees for the cook and food purchases ranged from approximately $120 to $240 every two
weeks. The food cooked by Pedro Carbajal, Sr. was usually salty and the meat at times appeared
to be spoiled. If the workers incurred any additional costs, that would also be deducted. For
example, at one point in the forest season one of the workers needed a new pair of shoes. Pure
Forest foreman Pedro Carbajal sold the worker an old pair of shoes that were held together with
nails for $100. Pedro Carbajal allegedly deducted this amount from the worker's pay. The
workers alleged that after all the deductions had been taken out of their pay, they were often left
with less than $100 for a two week work period.

29.    The workers provided DOL Special Agents with photos of Pedro Carbajal's campsite
in a forest, which showed multiple camping tents. Some of these pictures showed the workers
and Pure Forest's vehicles as subjects of the photos.

30.    On March 26, 2013, a former Pure Forest worker led DOL Special Agents to one of
Pure Forest's camp locations previously managed by Pedro Carbajal. The forestland, owned by
Sierra Pacific Industries, is open for hiking and biking. SA Collins walked through the former
campsite and saw ammunition shell casings on the ground. SA Collins also saw tree branches
hung horizontally between trees that the former worker explained were used to hang tarps over
the tents. Using a global positioning device, the coordinates of this location were identified as
39 59.216N 121 38.398W, which is located in Butte County. The Google Maps website
displayed a satellite image of this site, which shows two trailers and some blue tarps matching

the description of the tents the workers were required to use for sleeping. The site description

provided by the worker matched what was visible in the Google satellite photo.

31.     On December 5, 2013, DOL Special Agents and I interviewed Jose Luis Osorio

Amador (Amador), who at that point no longer worked as a foreman for Pure Forest. Amador

admitted that Jeff Wadsworth charged workers $1,600 to $1,800 for the visas. Amador told me

that he collected visa fees from the workers, or the workers' respective foremen, and then gave

the visa fee money, in cash, to Jeff Wadsworth in an envelope. Amador also confirmed that

workers drank water from a river and slept in tents. Amador said that Jeff Wadsworth wanted

the workers to work for 12 to 13 hours a day. Amador believed that Jeff Wadsworth was

dishonest and wanted to exploit the workers.

32.     During an interview on April 30, 2014, Amador also told a DOL Special Agent that

Jeff Wadsworth would travel from Idaho to California to conduct Pure Forest business. Jeff

Wadsworth would commute from Idaho to California in either a red 2006 Ford F-350 truck or an

orange 1999 Ford F-350 truck. According to this source, current foreman Pedro Carbajal is now

driving the red 2006 Ford F-350 truck.

33.     Amador also told us that Jeff Wadsworth tried to get a bigger contract from Sierra

Pacific Industries by offering a bribe to a company official, but was unsuccessful. Amador

believed that Sierra Pacific Industries was no longer working with Jeff Wadsworth because of

this incident. On November 19, 2013, the DOL spoke to a former Sierra Pacific Industries

employee who also heard that Pure Forest was no longer a contractor with Sierra Pacific because

Jeff Wadsworth attempted to bribe a company official for a bigger contract. On March 18, 2014,

SA Collins and I spoke with district managers of Sierra Pacific Industries who previously

worked directly with Pure Forest. They stated that Jeff Wadsworth offered to make a personal

payment of money to one of Sierra Pacific Industries' foresters if Pure Forest got a contract with the company. Sierra Pacific Industries counsel stated that the company preferred to not do business with Jeff Wadsworth after this incident, but were open to working with Owen Wadsworth in the future.

34.    DOL Special Agents showed Amador copies of the envelopes provided by the workers, which were allegedly used to distribute payroll to the workers. Amador said that the writing on the envelopes was his and that the workers whose names were on the envelopes were on Pedro Carbajal's crew. Amador claimed that he did not like the way Jeff Wadsworth ran the company, and that Amador wanted to pay workers a higher wage, but Jeff Wadsworth refused. Amador said that the workers on his crew got paid $12 an hour, but he does not know how the other foremen managed their workers.

35.    Amador provided DOL Special Agents with timesheets for the workers on his crew. These timesheets list the workers on the crew by name and indicated how many hours were spent working on a specific plot of land. Amador explained that the hours of work each week would vary depending on weather conditions. Analysis of the timesheets for the months of May and August 2012 shows that Amador's crew worked up to 57 hours a week and averaged 49 hours a week.

36.    Amador was a foreman with Pure Forest who kept numerous physical and electronic records relating to Pure Forest business at his residence. Pedro Carbajal is a foreman with Pure Forest and likely keeps records and electronic storage media at his residence, the SUBJECT PREMISES.

37.    During the investigation, the DOL's Special Agents obtained and executed a search warrant for an email account associated with Jeff Wadsworth. In preparation for the next

forestry season, on June 20, 2013, Jeff Wadsworth sent an e-mail stating: "my only concern is housing what if someone lives close by and wants to stay at their own or a friends [sic] home is mike requiring us to force them to stay with us or can we omit the housing clause at our discression [sic]." That same day, Owen Wadsworth responded to this e-mail in which he stated: "I assume that would be fine, he did say that we didn't need anything at all if we are using hotels, how would that be any different? I guess they want us to certify only if we use trailers." On July 3, 2013, Owen Wadsworth forwarded an e-mail to Jeff Wadsworth. The forwarded message contained an e-mail from Mike Alcorn of Green Diamond, another forestry company, in which Alcorn told Owen Wadsworth: "I checked into the housing authorization with our guy in Seattle. He said go ahead and stay in the trailers. It would be a good idea to document what you have done to comply with the housing authorization and in the long term it may be beneficial to pursue the authorization further. But that's your call." Owen Wadsworth responded "Ok, thanks" and forwarded the message to Jeff Wadsworth.

38.    On May 22, 2013, Jeff Wadsworth received an email from Richard Last Name Unknown (LNU) with Specialty Safety Training asking if Wadsworth had his "crew' together for a meeting. Wadsworth replied by saying that the crew is working together in Auburn. Additionally, Jeff Wadsworth wrote: "pedro is our new number 1"; that "he lives at 617 mariposa in gerber"; that "I would think training at his house"; and "you can set it up with him anytime you like."

39.    On June 26, 2013, Jeff Wadsworth forwarded an email to Pedro Carbajal at pureforestpedro@gmail.com requesting that he contact Richard LNU regarding this training. Regarding the pureforestpedro@gmail.com account, on June 29, 2012, "John Ellis" sent an email to Jeff Wadsworth saying: "Double check to make sure Pedro is the one that changed his

password on his Gmail account. I have received this because my email is associated with his

account, just in case there is a problem." Jeff responded in an email saying: "I changed it" "just

got him up and running" "thanks" "jeff".

40.     E-mails between Jeff Wadsworth and Owen Wadsworth also discuss potential

fraudulent immigration documents. Jose Luis Osorio Amador stated to me in at least two

interviews that Pure Forest has a history of hiring undocumented workers to work in the forests.

On July 5, 2013, Jeff Wadsworth sent an e-mail to Owen Wadsworth containing an attachment

of a Social Security Card and Permanent Resident Card. In the e-mail, Jeff Wadsworth stated:

"Have him be sure his new card is issued to the same name, Efrain Ortega Hernandez." On July

22, 2013, Jeff Wadsworth sent another e-mail to Owen Wadsworth stating: "Tell efrain [sic]

thanks for sending another copy of the social that isn't in the ca [sic] hit list but what we needed

is a copy of his new social that is not on anyones [sic] hit list." To date, this investigation has

not revealed enough information to explain who Efrain Ortega Hernandez is or what the

California "hit list" is.

41.     In reviewing Jeff Wadsworth's emails, the investigation uncovered numerous

instances in Jeff Wadsworth's email traffic of Pure Forest employees using the SUBJECT

PREMISES as their address for payroll purposes. For instance in an attachment that was entitled

"Pure Forest Payroll Ending 11/22/2013," Gumesindo Ortega Miranda utilized the address of the

SUBJECT PREMISES. On another occasion in an attachment entitled "Pure Forest Payroll

Ending 8/16/2013," three individuals, Diego Guarchaj-Guarchaj, Efrain Ortega-Hernandez, and

Rudy Sequez, utilized the address of the SUBJECT PREMISES.

42.     There were also paystubs from Pure Forest located in Jeff Wadsworth's email where

the workers utilized the SUBJECT PREMISES as their address. For example, Antonio Garcia

17

and Carlos Otionel Lopez Chavez used that address.  For W-2 purposes, Rudy Sequec and

Anmaria Ortega used the address of the SUBJECT PREMISES with the employer being

Lightning W Ranch DBA Pure Forest.

43.    On December 5, 2013, Jose Luis Osorio Amador stated to me and DOL Special

Agents that the ownership of Pure Forest was now in the name of Owen Wadsworth.  On March

18, 2014, SA Collins and I spoke with district managers of Sierra Pacific Industries who told us

that Owen Wadsworth was now running Pure Forest.  Corroborating this, on May 24, 2013, Jeff

Wadsworth sent an e-mail to a third party stating that Owen Wadsworth will step into his role at

Pure Forest and Jeff Wadsworth would "start fading into the woodwork."

44.    On April 11, 2014, HSI personnel saw two vehicles, SUBJECT VEHICLE # 1 and

SUBJECT VEHICLE # 2, with California license plates on the street parked in front of the

SUBJECT PREMISES.  SUBJECT VEHICLE # 1 is registered to Pedro Carbajal with an

address of the SUBJECT PREMISES.  SUBJECT VEHICLE # 2 was registered to Jeffrey or

Owen J Wadsworth at 70 E 2125 S, Oakley City (sic), ID.  Vehicles are further described with

photographs in Attachment A-2.

45.    On April 30, 2014, a source confirmed that Pedro Carbajal and his family still reside

at 617 Mariposa Avenue, Gerber, CA.  Additionally, a former Pure Forest employee indicated

that Pedro Carbajal is still employed by Pure Forest.

**EVIDENCE LIKELY TO BE FOUND AT PREMISES TO BE SEARCHED**

46.    Based on the information provided in this affidavit, there is probable cause to believe

that the SUBJECT PREMISES and SUBJECT VEHICLES contain evidence, fruits, and

instrumentalities, as reflected in Attachment B, of violations of:  18 U.S.C. § 1589 (Forced

Labor Trafficking); 18 U.S.C. § 1590 (Trafficking with Respect to Peonage, Slavery,

Involuntary Servitude, or Forced Labor); 18 U.S.C. § 1351 (Fraud in Foreign Labor

Contracting); 18 U.S.C. § 1546 (Visa Fraud); 18 U.S.C. § 1341 (Mail Fraud); and 18 U.S.C.

§ 1343 (Wire Fraud). As further described in Attachment B, this includes physical evidence

such as a firearm or firearms, and additional company information relating to topics including

applications for the H-2B visas, worker housing, worker pay, and other evidence, fruits, and

instrumentalities of the above-stated violations.

47.    Based on my training and experience, and based on my consultations with other

Special Agents who are experienced in the investigation of labor visa fraud offenses, I know that

persons engaged in criminal business schemes often maintain records of their transactions

similar to the record-keeping practices of law abiding businesses. Even after the fraud is

completed, persons engaged in fraudulent schemes routinely maintain documentary records over

a long period of time, even years, to memorialize past transactions, payments by victims, records

of accounts receivable, and names, addresses and phone numbers of victims/investors. These

records are routinely maintained on paper, such as business and personal ledgers, diaries,

calendars, memoranda, investor lists, and telephone address books. These records are commonly

kept at the business location and the person's home.

48.    In this investigation, I also know from my training, experience and discussions with

other agents involved in the investigation that Pure Forest and its foremen will likely have

employee or personnel files for its foremen and employees Pure Forest employed through the H-

2B program. Like many businesses with foreign workers, their records are likely to contain

employment applications, wage and salary information, contracts, employment offers, purchase

orders, Social Security Number forms, copies and originals of government documents related to

immigration and visa filings, and invoices to and from vendors, customers, clients, as well as company organization charts.

## SEARCH AND SEIZURE OF COMPUTERS, ELECTRONIC STORAGE DEVICES/DIGITAL DATA, AND FORENSIC ANALYSIS

49.    This application seeks permission to search for and seize evidence (and contraband) of the crimes described above stored on computers and electronic/digital devices (collectively, "digital devices"), as well as any digital devises that constitute fruits and instrumentalities of the crimes.

50.    Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that data in digital form can be stored on a variety of systems, storage devices, or media including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

51.    Based upon my training and experience, and the investigation to date, I believe that computer(s) and digital device(s) will be found at the premises.

52.    Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information. I know that it is common today for businesses to utilize computers to conduct their business and to store information related thereto. I also know that it is common for individuals to have personal computers and to use these computers to conduct their personal affairs, their business affairs, and to store

20

information related thereto. I know based on my training and experience, that subjects who are engaged in those offenses commonly store information related to their activities on computers and digital devices.

**Removal of Data Storage Devices for Review In A Laboratory Setting May Be Required**

53.     Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that a forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data. I also know that it is frequently necessary to remove digital devices or media for later laboratory evaluation off-site under controlled circumstances. This is true for a number of reasons, including the following:

a.      Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

b.      Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence. The recovery of such data may require

the use of special software and procedures, such as those used in a law enforcement laboratory.

c.      The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  Storage devices capable of storing 500 gigabytes of data are now commonplace in desktop computers.  It can take several hours, or even days, to image a single hard drive.  The larger the drive, the longer it takes.  Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can become impractical.

d.      Since digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted.  Software used in a laboratory setting can often reveal the true nature of data. Moreover, a computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

e.      Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used.  For example, searching by keywords, which is a limited text based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process.  The computer may have stored information about the data at issue which may not be searchable text,

22

such as: who created it; when and how it was created, downloaded, or copied; when it
was last accessed; when it was last modified; when it was last printed; and when it was
deleted. The relevance of this kind of data is often contextual. Furthermore, many
common email, database, and spreadsheet applications do not store data as searchable
text, thereby necessitating additional search procedures. To determine who created,
modified, copied, downloaded, transferred, communicated about, deleted, or printed data
requires a search of events that occurred on the computer in the time periods surrounding
activity regarding the relevant data. Information about which users logged in, whether
users shared passwords, whether a computer was connected to other computers or
networks, and whether the users accessed or used other programs or services in the
relevant time period, can help determine who was sitting at the keyboard.

f.      Searching digital devices can require the use of precise, scientific procedures
designed to recover latent data. The recovery of such data may require the use of special
software and procedures. Data that represents electronic files or remnants of such files
can be recovered months or even years after it has been downloaded onto a hard drive,
deleted, or viewed via the Internet. Even when such files have been deleted, data can be
recovered months or years later using readily available forensic tools. Normally, when a
person deletes a file on a computer, the data contained in the file does not actually
disappear; rather, that data remains on the hard drive until it is overwritten by new data.
Therefore, deleted files, or remnants of deleted files, may reside in space on the hard
drive or other storage media that is not allocated to an active file. In addition, a
computer's operating system may keep a record of deleted data in a swap or recovery file

or in a program specifically designed to restore the computer's settings in the event of a system failure.

54.     This warrant seeks authority to seize contextual data, that is, evidence of how a digital device has been used, what it has been used for and who has used it.  It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person.  Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

a.     In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user.  Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage.  Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question.  Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

b.     Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been

24

deleted from a word processing file). Virtual memory paging systems can leave digital
data on the hard drive that show what tasks and processes on the computer were recently
used. Web browsers, email programs, and chat programs store configuration data on the
hard drive that can reveal information such as online nicknames and passwords.
Operating systems can record additional data, such as the attachment of peripherals, the
attachment of USB flash storage devices, and times the computer was in use. Computer
file systems can record data about the dates files were created and the sequence in which
they were created. This data can be evidence of a crime, can indicate the identity of the
user of the digital device, or can point toward the existence of evidence in other locations
(or on other devices).

c.      Further, evidence of how a digital device has been used, what it has been used for,
and who has used it, may be learned from the absence of particular data on a digital
device. Specifically, the lack of computer security software, virus protection, malicious
software, evidence of remote control by another computer system, or other programs or
software may assist in identifying the user indirectly and may provide evidence excluding
other causes for the presence or absence of the items sought by this application.
Additionally, since computer drives may store artifacts from the installation of software
that is no longer active, evidence of the historical presence of the kind of software and
data described may have special significance in establishing timelines of usage,
confirming the identification of certain users, establishing a point of reference for usage
and, in some cases, assisting in the identification of certain users. This data can be
evidence of a crime, can indicate the identity of the user of the digital device, or can point
toward the existence of evidence in other locations. Evidence of the absence of particular

data on the drive is not generally capable of being segregated from the rest of the data on

the drive.

### Search Procedure

55.    In searching for data capable of being read, stored, or interpreted by a computer or

storage device, law enforcement personnel executing the search warrant will employ the

following procedure:

a.    *On site search, if practicable.* Law enforcement officers trained in computer

forensics (hereafter, "computer personnel"), if present, may be able to determine if digital

devices can be searched on site in a reasonable amount of time and without jeopardizing

the ability to preserve data on the devices and conduct such a search if deemed

practicable. Any device searched on site will be seized if it contains any data falling

within the list of items to be seized as set forth in the warrant and in Attachment B.

b.    *On site imaging, if practicable.* If a digital device cannot be searched on site as

described above, the computer personnel, if present, will determine whether the device

can be imaged on site in a reasonable amount of time without jeopardizing the ability to

preserve the data and conduct such imaging if deemed practicable.

c.    *Seizure of digital devices for offsite imaging and search.* If no computer

personnel are present at the execution of the search warrant, or if they determine that a

digital device cannot be searched or imaged on site in a reasonable amount of time and

without jeopardizing the ability to preserve data, the digital device will be seized and

transported to an appropriate law enforcement laboratory for review.

d.    Law enforcement personnel (potentially including, but not necessarily limited to,

computer personnel) will examine the digital device to  determine if it contains any data

26

that falls within the list of items to be seized as set forth in the warrant and in Attachment B.

e.     Law enforcement personnel will use procedures designed to identify items to be seized under the warrant.  These procedures may include, without limitation, the use of a "hash value" library to exclude normal operating system files that do not need to be searched.   In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

f.     If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.  If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence.  If the government needs additional time to determine whether an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.

g.     If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original

digital device to its owner within a reasonable period of time if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

## Data to be Seized

56.     Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

a.      Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

b.      Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

c.      Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD Rs, CD RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to

commit or further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

d.     Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

e.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.     Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

g.     Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

h.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

## Retention of Image

57.     The government will retain a forensic image of each digital device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to any potential questions regarding the corruption of data; establishing the chain of custody of data; refuting any potential claims of fabrication, tampering, or destruction with/of data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

## INVENTORY AND RETURN

58.     With respect to the seizure of electronic storage media or the seizure or imaging of electronically stored information, the search warrant return to the Court will describe the physical storage media that were seized or imaged.

## ITEMS TO BE SEIZED

59.     The United States seeks authority to search the SUBJECT PREMISES at 617 Mariposa Avenue, Gerber, CA, 96035, and the SUBJECT VEHCILES listed above, as further

described in Attachment A, for the items described in Attachment B, which constitute the

evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1589 (Forced Labor

Trafficking); 18 U.S.C. § 1590 (Trafficking with Respect to Peonage, Slavery, Involuntary

Servitude, or Forced Labor); 18 U.S.C. § 1351 (Fraud in Foreign Labor Contracting); 18 U.S.C.

§ 1546 (Visa Fraud); 18 U.S.C. § 1341 (Mail Fraud); and 18 U.S.C. § 1343 (Wire Fraud).  All

attachments are incorporated by reference.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

31

## REQUEST FOR SEALING

60.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Eugene Kizenko
Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations

Approved as to form:

Nirav K. Desai
Assistant U.S. Attorney

Subscribed and sworn to before me on May 6, 2014

HONORABLE ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

32

## ATTACHMENT A
### Description of Locations and Vehicles to be Searched

### ATTACHMENT A-1 (SUBJECT PREMISES)

### Home located at 617 Mariposa Avenue, Gerber, California 96035

The SUBJECT PREMISES are described as follows, and as depicted in photographs below:

- A single story family home with a shingled roof.
- The property has a wooden fence bordering the front of the property.
- There are black numbers "617" to the right of the front door.
- There are windows on either side of the front door.
- There is a black mailbox on a white post that faces Mariposa Avenue.



Areas to be searched include all rooms, common areas, attics, basements, and all other parts therein, and surrounding grounds, garages, storage sheds, storage rooms, barns, trailers, or outbuildings of any kind, attached or unattached, including if locked or closed, located on the SUBJECT PREMISES, that may contain items set forth in Attachment B. Areas to be searched also include locked, closed, barred, encircled or other otherwise secured containers located on the SUBJECT PREMISES.

[continued on next page]

1

## ATTACHMENT A-2 (SUBJECT VEHICLES)

The SUBJECT VEHICLES are described as follows, and as depicted in photographs below, and the areas to be searched include all internal and external compartments and all containers, locked or unlocked, in which evidence, fruits, and instrumentalities, as described in Attachment B, may be found:

### SUBJECT VEHICLE # 1



- 2001 four door silver Nissan pickup truck with a travel rack with Crew Cab imprinted on it
- Nissan imprinted above truck handle
- California license plate 6L60117
- Frontier imprinted on truck door bed

[continued on next page]

2

## SUBJECT VEHICLE # 2



- 2000 gray Ford F250 four door pickup truck
- California License Plate 04453J1
- Step to enter the vehicle located under the doors
- Large black storage container attached to top of bed of vehicle
- 4 x 4 sticker is on rear passenger panel of vehicle

**[END OF ATTACHMENT A]**

3

## ATTACHMENT B

### Items to be Searched For, Seized, and Examined

The following records and items, in whatever form and by whatever means they may

have been created and/or stored, that constitute evidence, contraband, fruits, and/or

instrumentalities of violations of 18 U.S.C. § 1589 (Forced Labor Trafficking); 18 U.S.C. § 1590

(Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor); 18

U.S.C. § 1351 (Fraud in Foreign Labor Contracting); 18 U.S.C. § 1546 (Visa Fraud); 18 U.S.C.

§ 1341 (Mail Fraud); and 18 U.S.C. § 1343 (Wire Fraud); for the time period of January 1, 2011

to the present (unless specified otherwise), including but not limited to:

      1.     Any and all firearms, ammunition, and related accessories.

      2.     Camouflage clothing including shirts, pants, jackets, hats, masks, and other

accessories.

      3.     Equipment related to camping including tents, sleeping bags, tarps, and ropes.

      4.     Pesticides, herbicides, chemicals, rubber gloves, cloth gloves, overalls, and

related spraying or application equipment.

      5.     Records and items indicating or reflecting control, management, ownership, and

locations of operations of Pure Forest, LLP, Lightning W Ranch, LLC, and Lightning W Ranch,

LLC doing business as Pure Forest, including utility bills, telephone bills, loan payment receipts,

rent documents, keys, photographs, bank records, and payroll records;

      6.     Bank records or records received from other financial institutions, such as wire

transfer records, bank statements and associated transactional records, credit card statements,

money drafts, letters of credit, safety deposit box keys and records, checkbooks, money

wrappers, money containers, income tax returns, payroll records and any other records of

1

financial transactions that reflect the disposition and/or allocation of monies that represent fruits, evidence, and/or instrumentalities of violations of the above-stated statutes;

7.      Records and items that constitute fruits, evidence, instrumentalities of the acquisition, secreting, transfer, concealment, and/or expenditure of money that represent fruits, evidence, and/or instrumentalities of violations of the above-stated statutes;

8.      Records and items reflecting the purchase or lease or financing or encumbrance of real estate, vehicles, precious metals, jewelry, or other items that constitute fruits, evidence, and/or instrumentalities of violations of the above-stated statutes;

9.      Records and items relating to the H-2B labor visa program including applications and petitions related to the program (e.g., Form I-129, ETA Form 9142, Form DS-160, Form WH-530), draft applications and petitions, visas, travel documents, notices, memoranda, labor advertisements, applications for employment, contracts, certifications, phone records, letters, e-mails, facsimiles, and other forms of correspondence;

10.     Records and items relating to the recruitment and hiring of employees/laborers of Pure Forest, LLC and/or Lightning W Ranch, LLC including H-2B labor visa program workers, including advertisements, notices, applications for employment, memoranda, phone records, travel records, spreadsheets, letters, e-mails, facsimiles, and other forms of correspondence;

11.     Records relating to the employment, management, and transport of employees/laborers of Pure Forest, LLC and/or Lightning W Ranch, LLC including H-2B labor visa program workers, including payroll records, checks, personnel files, ledgers, spreadsheets, invoices, promissory notes, visas, travel documents, car rental agreements, supply lists, memoranda, phone records, travel and lodging records, letters, e-mails, facsimiles, and other forms of correspondence;

12.     Records reflecting the indebtedness of employees/laborers of Pure Forest, LLC and/or Lightning W Ranch, LLC, including H-2B visa program workers, to Pure Forest, LLC, Lightning W Ranch, LLC, and those entities' owners, managers, foremen, and other employees, and payments made by those employees/laborers to the owners, managers, foremen, and other employees of Pure Forest, LLC and/or Lightning W Ranch, LLC;

13.     Records relating to Owen Wadsworth, Pedro Carbajal, Jr., Pedro Carbajal, Sr., Arturo Carbajal, Cirilo Amador (a.k.a. Jose Luis Osorio Amador) including payroll records, checks, personnel files, employee or policy manuals, ledgers, spreadsheets, invoices, promissory notes, visas, travel documents, memoranda, phone records, travel and lodging records, letters, e-mails, facsimiles, and other forms of correspondence;

14.     Records relating to Infinity Labor Source including memoranda, presentations, advertisements, contracts, checks, invoices, payment records, phone records, letters, e-mails, facsimiles, and other forms of correspondence;

15.     Records relating to Sierra Pacific Industries including contracts to provide services, site maps, memoranda, invoices, checks, payment records, phone records, letters, e-mails, facsimiles, and other forms of correspondence;

16.     Records and items that fall into the categories above that are in an encrypted format, and any keys, access codes, or other information, documents, or items required to decrypt those records and items; and

17.     **Digital evidence as described below**:

a.     Any computer equipment or digital devices that are capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop

3

or notebook computers; personal digital assistants; wireless communication devices including paging devices, cellular telephones, and smartphones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communication devices such as modems, routers, cables, and connections; storage media; and security devices;

     b.    Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

     c.    Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

     d.    Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

     e.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

     f.    Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

4

g.      Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

h.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) or owners of the computers or digital devices during the time the device was utilized to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.


**[END OF ATTACHMENT B]**

AO 93 (Rev. 12/03) Search Warrant

# United States District Court

| **EASTERN** | District of | **CALIFORNIA** |

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

The Premises Located at 617 Mariposa Avenue, Gerber, CA 96035; a Silver Nissan Pickup Truck (CA 6L60117); and a Grey Ford Pickup Truck (CA 04453J1

## SEARCH WARRANT

CASE NUMBER:
2:14-SW-297 AC

TO, <u>Special Agent Eugene Kizenko</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Eugene Kizenko who has reason to believe

that ☐ on the person of, or ☒ on the premises known as (name, description and/or location)

**SEE ATTACHMENT A, attached hereto and incorporated by reference**

in the _____ **EASTERN** _____ District of _____ **CALIFORNIA** _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ May 20 2014 _____
(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and making the search ☒ in the daytime — 6:00 AM to 10:00 P.M. ☐ at any time in the day or night as I find reasonable cause has been established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to <u>any authorized U.S. Magistrate Judge in the Eastern District of California</u>, as required by law.

U.S. Magistrate Judge (Rule 41(f)(4))

5/6/14 _____ at _____ Sacramento, California
Date and Time Issued                    City and State

Allison Claire, U.S. Magistrate Judge _____ Signature of Judge

AO 93 (Rev. 12/03)  Search Warrant (Reverse)

| RETURN | | Case Number: |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT RECEIVED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
| INVENTORY MADE IN THE PRESENCE OF | | |

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____      _____
Signature of Judge                          Date

## ATTACHMENT A
### Description of Locations and Vehicles to be Searched

### ATTACHMENT A-1 (SUBJECT PREMISES)

### Home located at 617 Mariposa Avenue, Gerber, California 96035

The SUBJECT PREMISES are described as follows, and as depicted in photographs below:

- A single story family home with a shingled roof.
- The property has a wooden fence bordering the front of the property.
- There are black numbers "617" to the right of the front door.
- There are windows on either side of the front door.
- There is a black mailbox on a white post that faces Mariposa Avenue.



Areas to be searched include all rooms, common areas, attics, basements, and all other parts therein, and surrounding grounds, garages, storage sheds, storage rooms, barns, trailers, or outbuildings of any kind, attached or unattached, including if locked or closed, located on the SUBJECT PREMISES, that may contain items set forth in Attachment B. Areas to be searched also include locked, closed, barred, encircled or other otherwise secured containers located on the SUBJECT PREMISES.

[continued on next page]

1

## ATTACHMENT A-2 (SUBJECT VEHICLES)

The SUBJECT VEHICLES are described as follows, and as depicted in photographs below, and the areas to be searched include all internal and external compartments and all containers, locked or unlocked, in which evidence, fruits, and instrumentalities, as described in Attachment B, may be found:

### SUBJECT VEHICLE # 1



- 2001 four door silver Nissan pickup truck with a travel rack with Crew Cab imprinted on it
- Nissan imprinted above truck handle
- California license plate 6L60117
- Frontier imprinted on truck door bed

[continued on next page]

2

## SUBJECT VEHICLE # 2



- 2000 gray Ford F250 four door pickup truck
- California License Plate 04453J1
- Step to enter the vehicle located under the doors
- Large black storage container attached to top of bed of vehicle
- 4 x 4 sticker is on rear passenger panel of vehicle

**[END OF ATTACHMENT A]**

3

## ATTACHMENT B

### Items to be Searched For, Seized, and Examined

The following records and items, in whatever form and by whatever means they may have been created and/or stored, that constitute evidence, contraband, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1589 (Forced Labor Trafficking); 18 U.S.C. § 1590 (Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor); 18 U.S.C. § 1351 (Fraud in Foreign Labor Contracting); 18 U.S.C. § 1546 (Visa Fraud); 18 U.S.C. § 1341 (Mail Fraud); and 18 U.S.C. § 1343 (Wire Fraud); for the time period of January 1, 2011 to the present (unless specified otherwise), including but not limited to:

1.      Any and all firearms, ammunition, and related accessories.

2.      Camouflage clothing including shirts, pants, jackets, hats, masks, and other accessories.

3.      Equipment related to camping including tents, sleeping bags, tarps, and ropes.

4.      Pesticides, herbicides, chemicals, rubber gloves, cloth gloves, overalls, and related spraying or application equipment.

5.      Records and items indicating or reflecting control, management, ownership, and locations of operations of Pure Forest, LLP, Lightning W Ranch, LLC, and Lightning W Ranch, LLC doing business as Pure Forest, including utility bills, telephone bills, loan payment receipts, rent documents, keys, photographs, bank records, and payroll records;

6.      Bank records or records received from other financial institutions, such as wire transfer records, bank statements and associated transactional records, credit card statements, money drafts, letters of credit, safety deposit box keys and records, checkbooks, money wrappers, money containers, income tax returns, payroll records and any other records of

1

financial transactions that reflect the disposition and/or allocation of monies that represent fruits, evidence, and/or instrumentalities of violations of the above-stated statutes;

7.      Records and items that constitute fruits, evidence, instrumentalities of the acquisition, secreting, transfer, concealment, and/or expenditure of money that represent fruits, evidence, and/or instrumentalities of violations of the above-stated statutes;

8.      Records and items reflecting the purchase or lease or financing or encumbrance of real estate, vehicles, precious metals, jewelry, or other items that constitute fruits, evidence, and/or instrumentalities of violations of the above-stated statutes;

9.      Records and items relating to the H-2B labor visa program including applications and petitions related to the program (e.g., Form I-129, ETA Form 9142, Form DS-160, Form WH-530), draft applications and petitions, visas, travel documents, notices, memoranda, labor advertisements, applications for employment, contracts, certifications, phone records, letters, e-mails, facsimiles, and other forms of correspondence;

10.     Records and items relating to the recruitment and hiring of employees/laborers of Pure Forest, LLC and/or Lightning W Ranch, LLC including H-2B labor visa program workers, including advertisements, notices, applications for employment, memoranda, phone records, travel records, spreadsheets, letters, e-mails, facsimiles, and other forms of correspondence;

11.     Records relating to the employment, management, and transport of employees/laborers of Pure Forest, LLC and/or Lightning W Ranch, LLC including H-2B labor visa program workers, including payroll records, checks, personnel files, ledgers, spreadsheets, invoices, promissory notes, visas, travel documents, car rental agreements, supply lists, memoranda, phone records, travel and lodging records, letters, e-mails, facsimiles, and other forms of correspondence;

2

12.     Records reflecting the indebtedness of employees/laborers of Pure Forest, LLC and/or Lightning W Ranch, LLC, including H-2B visa program workers, to Pure Forest, LLC, Lightning W Ranch, LLC, and those entities' owners, managers, foremen, and other employees, and payments made by those employees/laborers to the owners, managers, foremen, and other employees of Pure Forest, LLC and/or Lightning W Ranch, LLC;

13.     Records relating to Owen Wadsworth, Pedro Carbajal, Jr., Pedro Carbajal, Sr., Arturo Carbajal, Cirilo Amador (a.k.a. Jose Luis Osorio Amador) including payroll records, checks, personnel files, employee or policy manuals, ledgers, spreadsheets, invoices, promissory notes, visas, travel documents, memoranda, phone records, travel and lodging records, letters, e-mails, facsimiles, and other forms of correspondence;

14.     Records relating to Infinity Labor Source including memoranda, presentations, advertisements, contracts, checks, invoices, payment records, phone records, letters, e-mails, facsimiles, and other forms of correspondence;

15.     Records relating to Sierra Pacific Industries including contracts to provide services, site maps, memoranda, invoices, checks, payment records, phone records, letters, e-mails, facsimiles, and other forms of correspondence;

16.     Records and items that fall into the categories above that are in an encrypted format, and any keys, access codes, or other information, documents, or items required to decrypt those records and items; and

17.     **<u>Digital evidence as described below</u>**:

a.      Any computer equipment or digital devices that are capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop

3

or notebook computers; personal digital assistants; wireless communication devices including

paging devices, cellular telephones, and smartphones; peripheral input/output devices such as

keyboards, printers, scanners, plotters, monitors, and drives intended for removable media;

related communication devices such as modems, routers, cables, and connections; storage media;

and security devices;

      b.     Any computer equipment or digital devices used to facilitate the transmission,

creation, display, encoding, or storage of data, including word processing equipment, modems,

docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are

capable of being used to commit or further the crimes referenced above, or to create, access,

process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

      c.     Any magnetic, electronic, or optical storage device capable of storing data, such

as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or

memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic

notebooks, personal digital assistants, and cell phones capable of being used to commit or further

the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or

instrumentalities of such crimes;

      d.     Any documentation, operating logs, and reference manuals regarding the

operation of the computer equipment, storage devices, or software;

      e.     Any applications, utility programs, compilers, interpreters, and other software

used to facilitate direct or indirect communication with the computer hardware, storage devices,

or data to be searched;

      f.     Any physical keys, encryption devices, dongles, or similar physical items which

are necessary to gain access to the computer equipment, storage devices, or data;

g.     Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

h.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) or owners of the computers or digital devices during the time the device was utilized to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

**[END OF ATTACHMENT B]**

# Exhibit B

1 | BENJAMIN B. WAGNER
United States Attorney
2 | NIRAV K. DESAI
Assistant United States Attorney
3 | 501 I Street, Suite 10-100
Sacramento, CA  95814
4 | Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

5

6 | Attorneys for Plaintiff
United States of America

7

**FILED**

MAY 2 2 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

8 | IN THE UNITED STATES DISTRICT COURT

9 | EASTERN DISTRICT OF CALIFORNIA

10

11 | UNITED STATES OF AMERICA,

12 | Plaintiff,

13 | v.

14 | PEDRO CARBAJAL-OSORIO,
  aka Pedro Carbajal,
15 |   aka Pedro Carbajal, Jr.,

16 | Defendant.

CASE NO. 2:14 - CR - 0 1 5 0 JAM

VIOLATIONS:  18 U.S.C. § 922(g)(5) – Illegal Alien
in Possession of a Firearm; 18 U.S.C. § 922(g)(5) –
Illegal Alien in Possession of Ammunition;
18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) –
Criminal Forfeiture

17

18 | I N D I C T M E N T

19 | COUNT ONE:  [18 U.S.C. § 922(g)(5) – Illegal Alien in Possession of a Firearm]

20 | The Grand Jury charges:  T H A T

21 | PEDRO CARBAJAL-OSORIO,
  aka Pedro Carbajal,
22 |   aka Pedro Carbajal, Jr.,

23

24 | defendant herein, on or about May 8, 2014, in the County of Tehama, State and Eastern District of

25 | California, then being an alien illegally and unlawfully in the United States, did knowingly possess in

26 | and affecting interstate commerce, a firearm, that is, one 12-gauge shotgun, manufactured by the New

27 | England Firearms Company, serial number NF280417, said firearm having been previously shipped and

28 | transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(5).

INDICTMENT
PEDRO CARBAJAL-OSORIO

1

1  COUNT TWO:  [18 U.S.C. § 922(g)(5) – Illegal Alien in Possession of Ammunition]

2       The Grand Jury further charges:  T H A T

3                          PEDRO CARBAJAL-OSORIO,
                              aka Pedro Carbajal,
4                            aka Pedro Carbajal, Jr.,

5

6  defendant herein, on or about May 8, 2014, in the County of Tehama, State and Eastern District of

7  California, then being an alien illegally and unlawfully in the United States, did knowingly possess in

8  and affecting interstate commerce, ammunition, that is, 100 rounds of .22 caliber ammunition

9  manufactured by CCI, said ammunition having been previously shipped and transported in interstate

10 commerce, in violation of Title 18, United States Code, Section 922(g)(5).

11 FORFEITURE ALLEGATION:  [18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

12      1.     Upon conviction of one or more of the offenses alleged in Counts One and Two of this

13 Indictment, defendant PEDRO CARBAJAL-OSORIO shall forfeit to the United States pursuant to Title

14 18, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c), any

15 firearms and ammunition involved in or used in the knowing commission of the offenses.

16      2.     If any property subject to forfeiture, as a result of the offenses alleged in Counts One and

17 Two of this Indictment, for which defendant is convicted:

18           a. cannot be located upon the exercise of due diligence;

19           b. has been transferred or sold to, or deposited with, a third party;

20           c. has been placed beyond the jurisdiction of the Court;

21           d. has been substantially diminished in value; or

22           e. has been commingled with other property which cannot be divided without difficulty;

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

INDICTMENT                                    2
PEDRO CARBAJAL-OSORIO

1  it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

2  incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of

3  defendant, up to the value of the property subject to forfeiture.

4

5                                                       A TRUE BILL.

6

7                                        /s/ Signature on file w/AUSA

8                                        _____
                                         FOREPERSON

9

10  BENJAMIN B. WAGNER
    United States Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT                                        3
PEDRO CARBAJAL-OSORIO

No. _ _ _ _ _ _ _ _ _ _

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA
*vs.*

PEDRO CARBAJAL-OSORIO,
aka Pedro Carbajal,
aka Pedro Carbajal, Jr.

## I N D I C T M E N T

**VIOLATION(S):**  18 U.S.C. § 922(g)(5) – Illegal Alien in Possession of a Firearm;
18 U.S.C. § 922(g)(5) – Illegal Alien in Possession of Ammunition;
18 U.S.C. § 924(d)(1) and 28 U.S.C. §  2461(c) - Criminal Forfeiture

*A true bill,*

/s/ Signature on file w/AUSA

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Foreman.*

*Filed in open court this* 20th _ _ _ _ _ _ _ _ _ _ *day*

*of* _ _May_ _ _ _ _ _ _, A.D. 2014

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk.*

*Bail, $* _ _No Bail – Previously Ordered Detained._

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

GPO 863 525

## PENALTY SLIP

**DEFENDANT:**                  **PEDRO CARBAJAL-OSORIO,**
aka Pedro Carbajal,
aka Pedro Carbajal, Jr.

**COUNT ONE**
**VIOLATION**                   18 U.S.C. § 922(g)(5) - Illegal Alien In Possession of a Firearm

**PENALTY**                     Up to ten years imprisonment,
$250,000 fine,
Up to three years supervised release


**COUNT TWO**
**VIOLATION**                   18 U.S.C. § 922(g)(5) - Illegal Alien In Possession of Ammunition

**PENALTY**                     Up to ten years imprisonment,
$250,000 fine,
Up to three years supervised release


**ASSESSMENT**:                 Mandatory $100 penalty assessment for each count.


**FORFEITURE:**                 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c) - Criminal Forfeiture

**PENALTY:**                    As stated in the indictment.